enters versus Nicholson. Mr. O'Brien, Mr. Haywood. Good morning. Good morning, Your Honors. My name is Timothy O'Brien. I represent the appellant, Ricky Sanders, in this appeal. I'm reserving five minutes for rebuttal. This case involves Ricky Sanders, who worked for the VA hospital in a laundry room. We understand the facts. The facts. Why don't you tell us where the court was wrong? The court was wrong in its conclusion that the plaintiff did not offer any evidence of pretext in the case. The court's opinion makes a bold statement that there was no evidence of that. To the contrary, the record is complete and replete. What is the evidence of pretext here? We're only talking retaliation here. Right. The evidence of pretext in this case is in several different instances. First, the legitimate reasons that were advanced by the VA were that the two persons that were hired for the December position were better qualified than Mr. Sanders, and secondly, that Mr. Sanders had allegedly told the decision maker that he had taken a position in the food service area. As to the qualifications issue, it is very evident from the record that that's pretextual. Mr. Sanders, by the decision maker's own admission, was better qualified than the first person that the decision maker selected, Mr. Van Pelt. He testified specifically that Mr. Sanders was better qualified on the key issue of reliability. Mr. Glass established that as a significant criterion. Who was the one who had the 15 years' experience and was willing to relocate? Well, actually, Mr. White. He was the second one who was selected. In that, with respect to Mr. White also, Glass testified that Mr. White had no experience whatsoever in working in a laundry facility. He had no experience in working in an entry-level position compared to Mr. Sanders, who had a laundry list, if you will, of experience working in the laundry facility. But the most important, I think, factor is if you look at the VA's statement, its job description, it says we are looking for somebody who is interested in, who is motivated to do simple work. That was the standard for the position. It also says in the job description that there's no minimum required experience. If you look at Mr. White's application, there's a cover letter and then there's a resume. In both of those documents, he says, I'm looking for a job with significant responsibility. I want to be involved in strategic planning. So the first threshold requirement for the position was you had to have a desire to do simple work. The two people that Glass selected, neither one of them had that desire. They both had college degrees. So if you kind of reverse this, if this was a job application position that required a college degree, and they hired Mr. Sanders, and he's African American and Muslim, and these two other individuals were white, they would be able to argue, look, you hired somebody who didn't have the requisite qualifications. Here, it's just the obverse. They wanted somebody who could do basic functions, who could do simple work, who would be interested in that. And the person who met that standard was Mr. Sanders. The two people they hired didn't meet that in any way. Mr. O'Brien, is this case only about the permanent position, or does it also involve a claim of a failure to extend the temporary one-year position? There are two separate issues in this case. That's what I thought. I didn't want to interrupt you, but I thought that it had begun, frankly, with the claim that you didn't extend my temporary position, and then also temporarily, then you didn't give me a fair shot at the whole thing. Sure. The question was asked about pretext. As to the temporary position, the district court concluded that there was no prima facie case because Mr. Sanders had failed to establish that there was an adverse employment action. The lower court also concluded that the evidence supporting that claim was based upon Mr. Sanders' own testimony, and therefore it was insufficient to support the claim. There's two points about that. The claim with respect to the temporary position isn't that the temporary position didn't expire. It did expire. The point was that before it expired, back in August, after the suitability issue concerning the June position occurred, Mr. Battisti, who was the supervisor, the person in charge of HR for that division, told Mr. Sanders, we will extend your temporary employment if we can't find you a permanent position in the interim. Mr. Sanders testified to that. It's a record. In addition, if you look in the record, we cited Mr. Battisti's testimony where he acknowledged that that was likely what was said. So there's competent evidence of record. The point is the fact that the temporary assignment ended by its own terms doesn't alter the fact that Mr. Sanders has a claim where they made an agreement, even though they didn't have to. They made that agreement, and it becomes enforceable. We cited two-thirds. How does that become enforceable? Pardon me? How does that become enforceable? Where's the consideration for that? Are you saying it's a contract? No, I'm not. What I'm saying is that, for the moment, I can't recall the site chart, but there are two third-circuit cases dealing specifically with this issue, and I'll take my rebuttal off. I'll get those. Even though they're not obligated to do a certain thing, if it's agreed that they are going to do it and then don't do it because of retaliatory motive. Oh, that's very different. That's very different, and that's what we're contending here. Because keep in mind. They can't take any adverse job action. Correct. Retaliatory motive. They had agreed that they were going to do it. Does Batisti still have to have the authority to be able, or any of the parties here still have to have the authority to be able to extend it? Well, first off, if you look at Batisti's testimony, he said that all that had to be done in that case was for Glass to say, I wanted to extend it. And if he had, it would have been done in the normal course. Now what Batisti said was, well, I don't think it happened because Mr. Sanders was on light duty. Well, when Glass testified, he said, no, light duty had nothing to do with it. Never a consideration whatsoever in connection with that position. In addition, you have to take the sequence of events here. August 1st is when he files the first complaint.  Within a couple of weeks, a full-time permanent position becomes open on September 11th. Sanders isn't even considered. They hire two other people. When Glass is asked, do you have any explanation that would articulate how it was that Sanders didn't get that position given the fact that it was agreed that he'd get the next position, next available position? He said, no. I have no explanation. Now, Sanders was viewed by Glass as being highly successful. It's a rating that they actually have, which he said bordered on being outstanding. And he listed the areas that he was outstanding in, ethics, work ethic, reliability. So I think given the Third Circuit's precedent in this area, we have raised a question about the legitimacy of qualifications as being the basis for the determination of not choosing him. And then when you couple that with the... Not choosing him for the other temporary job that became available? Well, there's two things. One is, should they have extended his temporary assignment? We believe that we have set forth a case to establish that by virtue of the fact of Sanders' testimony and Batista's testimony confirming that that was the agreement. There was nobody else selected for that, so it's really not a pretext question. Whether it were not, we have shown that there's a retaliatory motive for not extending that. That's the first position. The second position is the one that became open in December of 2001. And with respect to that, they assert the better qualifications of Van Pelt and then of White. And I think the evidence... They're the ones who set out reliability as a key qualification and said that Sanders was the one who met that test. They said he had already established reliability, whereas White and Van Pelt had only established the potential for reliability. When you couple that with the sequence of events, they had notice on August 27th of the protected activity, didn't consider him for the September 11th position. With respect to the December position, the decision not to hire Sanders was made on January 23rd. That's when Van Pelt was hired. Prior to that, on January 3rd, they learned of his amended EEO complaint. On January 9th, Glass filled out a form providing information regarding the complaint, so it was within two weeks. The other evidence we have in this case is the direct evidence of the statement made by Mr. Mills. Mr. Mills said when asked what happened to this deal that we were going to give Sanders the next available position. And in response to that, he said everything is on hold because of the EEO complaint. Good. Let's hear from Ms. Haywood, and then we'll have you back for rebuttal. Thank you very much, Mr. O'Brien. Good morning. Good morning. May it please the Court, Rebecca Haywood on behalf of the Department of Veterans Affairs. There are two claims in this case, and I'd like to start with the first claim that deals with the expiration of Mr. Sanders' temporary employment. This term of employment was for one year, and it expired by its own terms. Mr. Sanders testified at his deposition that he understood this fact. We understand that. That's not the point. Once it expired and expired, it was gone. He had no right to expect that the temporary job would lead to a permanent job, and that was an accretion, or that the temporary job would get him a leg up for a second temporary job. I don't think that's what Mr. O'Brien is arguing. What he's arguing is that the reason that he did not get a second go-round was not because his temporary job expired in, I hate the term due course, but in due course, but because he had filed a complaint with the EEOC, and that was the reason he wasn't allowed to take a position or be considered for a position that otherwise, given Glass's recommendation, he would have been given. That's his argument, not the fact that the job expired. I understand that, but Mr. Sanders' statement that he was promised an extension is simply not supported by the record. That's an overstatement of the record. There clearly was a meeting in August of 2001 between the union representative who was representing Mr. Sanders as well as Mr. Batista and Mr. Glass, who was the decision-maker at the time, and during that meeting, there was discussions about trying to help Mr. Sanders in this regard, but there was certainly no promise to that regard. But isn't that enough to get a question? It's agreed there's a discussion and there's some statements about trying to help him, as you said, in this regard. He says, I was told that they were going to get me, there's something to the fact that I was told that I would be in line, next in line for a permanent position or for another temporary position, unsubstantiated except for his statement, but there's corroboration of a meeting and that something is said to help him. Why doesn't that get you past summary judgment? Certainly, on the date that Mr. Sanders' position expired, it's undisputed that four or five other employees were also let go. So you're talking about a federal agency that has certain budgetary constraints, and the evidence is that not just Mr. Sanders was let go, but that other employees were let go as well. Those budgetary constraints were there at the time of this meeting when something was done, something was said, whatever it was, to suggest that they were going to try to help him or keep him around. However it was phrased, and you say the record supports that allegation, it doesn't support specifics that he's alleging. Yeah, we understand that there are budgetary restraints, but how does that help you with the prima facie case of retaliation, that the reason that they did not give him the second shot was not because of the budget restraints or because of the temporary job that they otherwise clearly could not have offered him a position and would not have offered a position, but they didn't offer him the position because he'd run to the EEOC before on what appears to be a totally groundless and inept claim, but nevertheless he filed it and he had a right to file it. Well, the first question the district court addressed was, was the expiration itself a materially adverse employment action? So the question is, was that materially adverse? The real question here, and the problem here, is that Mr. Sanders is really complaining about the two job openings that occurred in September of 2001. There were two openings in the laundry. The problem, though, is Mr. Sanders did not exhaust his administrative remedies with regard to those claims. That would have been his claim, you told me you were going to help me, there were these two openings, and frankly, because those weren't exhausted, the record is not even clear as to who was selected for those positions, and it's undisputed, Mr. Glass said, oh, I don't even remember, but Mr. Glass is running a laundry department with numerous employees to expect him two years later on a claim that wasn't exhausted to know the specifics, it was understandable for him not to be able to recall because those claims weren't exhausted. And when you're talking about the temporary position itself, the expiration of that simply was not an adverse employment action. Now turning to the second claim, the December opening, certainly Mr. Sanders' non-selection was certainly an adverse employment action. The question is, is there a pretext? And it's the government's position that these questions are a matter of judgment. Mr. Glass made two different selections. First, he selected Mr. Van Pelt, who declined the position, then he selected Mr. White. We could argue all day about who was the better qualified candidate. Forty different individuals, it's my recollection, were deemed to be qualified. Mr. Glass had to select off of that list. He doesn't interview the individuals. He doesn't have the time. He looked at the resumes and, you know, certainly a college degree, that was something that was raised by the government below. But if you look at Mr. Glass' – It's reversed here, doesn't it? Well, actually, that was raised by the lawyers. When you look at Mr. Glass' testimony about why he selected these two individuals, he talked about their work history and prior record. And in the context, if you look at that portion of the record, it's really about Mr. Glass looking at their record and saying it's their work history, 13 years versus three or four. Mr. White had wanted to move back to help an ailing mother, and he actually had almost 20 years of constant continuous work experience. Mr. White is still employed by the VA in the laundry department, although now full-time. Mr. Glass testified he was certainly not only more than pleased with the selection of Mr. White in the position. So, yes, Mr. Sanders clearly was also qualified, but, you know, Mr. Glass had the right. He has a right to make a good or bad decision as long as it's not a retaliatory one. And when you talk about timing, Mr. Glass did know in August of 2001 that Mr. Sanders had filed EEO claims. So the decision made later in January 2002, there's nothing unduly suggestive about that. And there is one argument here. Mr. Glass was asked to fax to EEO in January. He sent a fax January 9, 2002, to the Human Resources Department about his laundry department. And there's a claim here that that dealt with Mr. Sanders. It's not clear from the record at all. It's actually asked for a sex and race breakdown. And Mr. Sanders never had a gender claim in this case. So it's not even clear at all that that document pertained to Mr. Sanders. There are numerous employees in the laundry department, many of whom could have EEO claims. It's just not clear in the record that that document would indicate that Mr. Glass had knowledge of an EEO claim on behalf of Mr. Sanders. I don't understand what you're saying by that. You're saying that it's not clear when he became aware of the EEOC claim? He knew in August 2001 that Mr. Sanders had filed the first claim, but he wasn't aware of a second claim. That document doesn't prove that, oh, right before he made the second employment decision at issue here, that he was aware that there was another EEO claim on behalf of Mr. Sanders. Mr. Batista did know that, but Mr. Glass was the decision maker in this case. And one other thing I would like to mention is that there's some question here about whether this is a mixed motive case or pretext. That was not raised before the district court. It's not addressed in the district court's opinion. And it's the position of the government that even accepting the two statements that are made here, that's not significant enough to turn this pretext case into a mixed motive case that would change the burden of causation in this case. Are there any further questions? Thank you very much. Very good. Ms. Hayworth, thank you very much. Mr. O'Brien. The issue of longevity, in other words, how long did somebody work in the federal system, according to Glass at page 256 of the transcript, the reason he looks at work history is to determine whether or not the person has the potential to be a reliable worker. That's the sole reason that he does that. So if somebody had 15 years of experience, he's looking at that to see, well, perhaps that person will be reliable when we hire him. The reason why Sanders is better qualified in connection with that issue is that Glass concluded that Sanders had proven to him that he was reliable. So Sanders had a proven track record of reliability. The other two candidates only had a potential to be reliable. In the Brewer case, this court said that if you set out a particular factor to be a key characteristic as to qualifications, you can't shy away from that. And in this case, they said reliability. So they had three candidates. Sanders, who had proven to Glass that he was reliable, and they had two other people who had only the potential to be reliable. So from that standard, their own evaluation, Sanders is better qualified. And again, they still don't address the issue of these individuals having... On the mixed motive matter, is it correct that this was not raised before the district court? No, we raised it. It wasn't addressed by the district court. You raised it? I believe we did. Well, the court, in any event, I think we did. In any event, the court said there was no evidence whatsoever of pretext. But I do believe we raised this particular statement made by Mills that everything was on hold. And again, in the context of the agreements that were made, that statement rather does explain... Did you raise it in a way that the district court would have known that you did raise it? Yes, I believe we did. And that the burden shifting would be different? Yes, I believe we did. I don't recall right now the exact portion of the brief that we did. We dealt primarily with looking at this as a McDonnell Douglas case, but I think we did include that. The other point on notice with respect to whether Glass knew that the information he was asked to submit was with respect to Sanders. The document itself, while seeking the information, says it's in connection with the Sanders EEO claim. So he had notice January 3rd, provided information January 9th. January 23rd, he decided not to hire Sanders. What about Mr. Hayward's position that as to the second temporary position, him not getting that under the law is simply not an adverse job action? Again, the fact that it expired is not an adverse job action. It's not. What is adverse is to have agreed that they were going to extend it, which they said they could do, and then didn't do it in retaliation for his protected conduct. It's two separate issues. Yes, the expiration of the temporary assignment is not an adverse action. But the refusal to extend or to give him another temporary assignment, which was agreed upon in retaliation for protected conduct, is actionable. The Fassold case holds that way. Thank you. Any other questions? Mr. O'Brien, thank you very much. The case was well argued, and we will take this matter under advisory.